IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RACHEL JONES,** <br>     **Plaintiff,** <br><br>     v. <br><br> **PENNSYLVANIA STATE POLICE,** <br> **CRAIG ACORD AND MIKE TINNENY,** <br>     **Defendants.** | **CIVIL ACTION** <br><br><br><br> **NO. 16-4205** |

### MEMORANDUM

  Plaintiff, Rachel Jones, brought this discrimination suit against her employer, the Pennsylvania State Police ("PSP"), her supervisor Sgt. Mike Tinneny, and her coworker, State Trooper Craig Acord.  Before the Court is a partial motion to dismiss the Plaintiff's federal and state sex discrimination, retaliation and hostile work environment claims against the PSP and Sgt. Tinneny, which shall be granted in part and denied in part.

### I. BACKGROUND

  On May 9, 2011, Plaintiff was hired as a Pennsylvania state trooper.  During the time pertinent to this lawsuit, she worked at the Trevose station, where she was the only female trooper.[1]  From June of 2013 to June of 2014, she was in a romantic relationship with her co-worker at the Trevose Station, Craig Acord.  This case centers on Acord's actions following their breakup, and the PSP's response.

---

[1] Plaintiff's Amended Complaint explicitly incorporates by reference the allegations contained within her Equal Opportunity Discrimination Complaint, Am. Compl. ¶ 14, which had been attached as Exhibit A to her original Complaint, but was not attached to her Amended Complaint.  Accordingly, the EEO Complaint is considered as part of the Amended Complaint, and factual allegations contained therein may be relied upon to overcome the pleading threshold.  *West Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 171 (3d Cir. 2013) ("[T]he amended complaint 'supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading.'" (quoting *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1504 (3d Cir.1996)).

Almost immediately after the relationship ended, Acord began attempting to re-initiate contact. Several days after they broke up, he told Jones he wanted "to get back together" and asked her to dinner, which she rejected, telling him "the relationship was over and she did not want to meet with him." Nonetheless, Acord persisted. Twice between July and September of 2014, while on duty in his patrol vehicle, he saw Jones in her personal vehicle and texted her asking where she was going. Four times between July of 2014 and February of 2015, Acord sent unsolicited gifts and flowers to Jones's apartment, and would leave candy and Pop Tarts in her work mailbox. He repeatedly asked Jones out on dates and to go on trips via text and in person, all of which she declined. On December 7, 2014, while she was practicing alone at her martial arts studio, he texted her asking her how practice had gone. This made Jones uneasy because she had not told him where she would be that day. She told him to stop texting her, but several days later he resumed.

As time went on, Acord's behavior escalated. He would sit "uncomfortably close" to Jones in the Trevose station patrol room. They worked opposite shifts, with Jones normally scheduled from 7:00 a.m. to 3:00 p.m. and 3:00 p.m. to 11:00 p.m. on alternate days and Acord on the 12:00 a.m. to 8:00 a.m. shift. When they overlapped at the Trevose station near the beginning or end of her shifts, Acord frequently sought to make contact with Jones. Throughout early 2015, Acord continued to send her unwanted texts, referring to Jones with pet names and asking her to move in with him. On March 27, 2015, she blocked his phone number on her personal phone. Undeterred, Acord attempted to reach out to Jones through the patrol vehicle Mobile Data Terminal. When Jones applied to a position in Harrisburg, Acord told her that he would follow her there. All of these behaviors caused Jones to "alter her work routine" to minimize the possibility of being in the station when Acord might be there.

2

The first time Jones discussed Acord's behavior with a supervisor was around the beginning of April of 2015 when Corporal Kevin Mills noticed she was scheduled to go to the shooting range at the same time as Acord and "approached her about the matter." Mills told Jones that he was aware of the situation, and offered to change their schedules so that Jones and Acord would not overlap at the shooting range, which Jones accepted. Mills asked whether she wanted him to report the matter to Tinneny. Jones declined, but agreed to update him if the situation did not improve.

Jones next raised Acord's behavior with a supervisor after the following three incidents occurred. First, on May 9, 2015, while Jones was on duty and sitting at a computer in the patrol room, Acord again sat "uncomfortably close" to her. He told her three times, "you'll always be my weet."[2] He then stood up, walked around behind her, and kissed her on the neck. Second, on June 8, 2015, after returning from a trip to Thailand, Acord approached Jones's car while she was parked in the station parking lot and told her, "I was thinking of you while I was there. I got you a present. I'll give it to you later." Third, on June 10, 2015, while she was on patrol parked in a center turnaround, Acord (who was also on duty) pulled in and winked at her. When they were both back at the station house, while Jones was leaning over a table to take a photograph of a schedule, Acord took a photograph of himself and Jones from behind.

On June 11, 2015, Jones contacted Corporal Hardeep Rai at about 9:30 a.m. and reported Acord's behavior. Rai indicated he would contact Tinney. Tinney told Jones to meet him in a Target parking lot nearby the station at about 10:30 p.m. When Jones arrived, Tinney told her to turn off her patrol vehicle computer. Jones explained the situation to Tinneny, who told her he would "take care of it and report to appropriate people." Later that evening, at 11:21 p.m., Jones

---

[2] "Weet" is a pet name Acord used for Jones during their relationship.

3

received a call from Lieutenant Joseph Sokolofski, who had spoken with Tinneny and asked follow-up questions.

On June 15, 2015, Sokolofski called Jones and told her that Acord had been instructed not to have any contact with Jones that was not work related. Jones told Sokolofski she was still concerned that they might be scheduled to work together on certain days, and that their regular shifts had an hour of overlap at the beginning and end. Sokolofski told her to let him know if there was a problem, but that he did not feel there was a need for an investigation. That same day, Captain Brian Tobin and Sokolofski issued Acord a "supervisor notation," but after conferring with the Equal Employment Opportunity Director, Captain Wendell Morris, decided not to investigate further. Several days later, Jones received a call from Morris, who told Jones that she would still have to work the same shift as Acord, but that if she transferred to Harrisburg and Acord tried to follow, he could "try to block that."

In July, Jones continued to raise her concerns about working the same or overlapping shifts with Acord to Tinneny, but he was dismissive of her concerns and kept the schedules unchanged. Tinenny told her "you'll be fine" and that he was "washing his hands of the situation." Believing that her supervisors' response was inadequate, Jones filed a formal complaint with the PSP's Equal Employment Opportunity Office on July 14, 2015, and with the federal Equal Employment Opportunity Commission on August 26, 2015. The PSP complaint initiated an investigation by the PSP's Internal Affairs Division ("IAD"). Sometime in August, Acord received a memorandum notifying him of this investigation. While the first investigation was pending, Acord remained at the Trevose station. In September of 2015, Tinneny denied Jones's request for overtime during the Pope's visit to Philadelphia rather than switching Acord's shift.

Despite the pending investigation, Acord persisted. As alleged in the Amended Complaint, in September 2015 Acord came to the Trevose station on multiple occasions outside his shift and made or tried to make contact with Jones. Am. Compl. ¶ 35. On November 17, 2015, Jones saw Acord parked in a patrol vehicle in her neighborhood, which was outside his patrol area. Jones reported this to Tinneny, who changed Jones's schedule on certain days and made a report to IAD, beginning a second investigation. Both of the IAD investigations resulted in findings that the complaints were "not sustained." Jones cites problems with how the investigations were handled, including not receiving any notification of the outcome, being denied access to the interviews, and the failure to consider as evidence messages from Acord to Jones sent over the MDT system.

While the second IAD investigation was pending, Acord was moved to the Dublin station, although his name continued to appear on the Trevose station schedule. Meanwhile, Jones filed for a Protection From Abuse ("PFA") order in commonwealth court, resulting in a temporary PFA issued on December 21, 2015 and a final (2-year) PFA issued on May 9, 2016. Following the finalization of the PFA, Jones was interviewed for a third IAD investigation and questioned with regard to the PFA, but was not told the subject of the investigation.

In May of 2016, Jones was promoted to Corporal and transferred to Philadelphia. Acord is still at Dublin. On May 11, 2016, Jones received a right-to-sue letter dated May 4, 2016, and commenced this lawsuit on August 3, 2016.

## II.     LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "In light

of *Twombly*, 'it is no longer sufficient to allege mere elements of a cause of action; instead a complaint must allege facts suggestive of [the proscribed] conduct.'" *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 177 (3d Cir. 2010) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

### III. DISCUSSION

#### A. Rule 12(b)(1) – PHRA Claims against the PSP

The PSP contends that Plaintiff's claims against it under the Pennsylvania Human Rights Act ("PHRA") must be dismissed on sovereign immunity grounds. "The Eleventh Amendment to the United States Constitution protects an unconsenting state or state agency from a suit brought in federal court, regardless of the relief sought." *Capogrosso v. The Supreme Court of New Jersey*, 588 F.3d 180, 185 (3d Cir. 2009). "[U]nless Congress has 'specifically abrogated' [a] state['s] sovereign immunity or a state has unequivocally consented to suit in federal court," the federal courts lack jurisdiction over suits against a state by a citizen of that state. *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 318 (3d Cir. 2013) (citation omitted).

Although Pennsylvania has waived its immunity to suit on PHRA claims in Pennsylvania courts, it has expressly reserved immunity to suit in federal courts. *See* 42 Pa. Cons. Stat. § 8521(b); *Abbott-Benson v. Cheyney Univ. of Pennsylvania*, No. 15-CV-1861, 2015 WL 5544968, at *5 (E.D. Pa. Sept. 18, 2015) ("While the Third Circuit has not ruled on this issue, the district courts have uniformly found that Pennsylvania has not consented to suit in federal court under the PHRA." (citing cases)). While it is true that Congress abrogated sovereign immunity under Title VII of the Civil Rights Act, Plaintiff's argument that the Court may therefore exercise supplemental jurisdiction over her PHRA claims without regard to

6

Pennsylvania's sovereign immunity is meritless. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984) (holding that supplemental jurisdiction cannot overcome immunity against state-law claims brought in federal court). Therefore, the motion to dismiss the PHRA claims against the PSP will be granted.

### B. Rule 12(b)(6)

#### 1. Sex Discrimination

Plaintiff's Title VII claims against the PSP and PHRA claims against Tinneny[3] allege sex-based discrimination on three theories of liability: (1) disparate treatment; (2) retaliation; and, (3) hostile work environment.

##### a. Disparate Treatment

The PSP and Tinneny argue that Plaintiff has failed to allege an adverse employment action as required for a disparate treatment claim under Title VII and the PHRA.

An adverse employment action is one that effects "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 152-53 (3d Cir. 1999) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). In the context of this case, where there was no termination – and Plaintiff was, in fact, promoted – the question is whether there are other acts "serious and tangible enough to

---

[3] The PHRA claims are asserted against Tinneny "in his individual capacity as supervisor," Am. Compl. ¶ 5, for aiding and abetting the PSP's violations of the PHRA. 43 P.S. § 955(e). The motion raises no sovereign immunity defense to the PHRA claims asserted against Tinneny, and the Court exercises supplemental jurisdiction. 28 U.S.C. § 1367(a). Because Pennsylvania courts "generally interpret the PHRA in accord with its federal counterparts." *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996), the substantive analysis of Plaintiff's PHRA and Title VII claims is identical except for accessory liability for individuals, *see infra* Part III(B)(2), a PHRA provision for which there is no Title VII counterpart.

alter [her] compensation, terms, conditions, or privileges of employment." *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (internal quotation marks and citations omitted).

The only act[4] that comes close is Tinneny's denial of Jones's request for overtime. Because Jones was denied an overtime shift that Acord was allowed to work – ostensibly to avoid the possibility of any contact between them – she contends that this amounted to disparate treatment because of sex. However, the failure to grant overtime on a single occasion is not serious enough to be an adverse employment action supporting a disparate treatment claim. *See Durham Life Ins. Co*, 166 F.3d at 153 (holding that an adverse employment action must "substantially decrease[] an employee's earning potential and cause[] significant disruption in his or her working conditions"). Accordingly, the motion to dismiss the Title VII and PHRA disparate treatment claims will be granted.

### b.   Retaliation

The PSP and Tinneny next move to dismiss the Title VII and PHRA retaliation claims for failure to allege a materially adverse action.

Retaliation claims differ from disparate treatment claims in that an adverse action may consist of any act that "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination,'" and is not limited to actions affecting the terms or conditions of employment. *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 195 (3d Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 58 (2006)). The PSP and Tinneny argue that following Plaintiff's June 11, 2015 complaint to Corporal Rai about Acord, Plaintiff fails to identify any acts by Defendants that were materially adverse to her employment. But because an adverse action need not effect a change in the terms or conditions

---

[4] Acord's actions towards Jones, and the PSP's and Tinenny's failure to separate Acord from Jones, while relevant to Plaintiff's retaliation and hostile work environment claims, are insufficient to make out an adverse employment action for a disparate treatment claim.

of employment to support a retaliation claim, the Amended Complaint is not deficient in this regard.

Moreover, Plaintiff alleges acts by Tinneny and Acord following Plaintiff's protected activity that could plausibly support a retaliation claim. These include Tinneny's denial of Jones's request for overtime during the Pope's visit, and also Acord's harassing behavior[5] in September and November of 2015. Because a reasonable worker might be "dissuaded . . . from making or supporting a [sexual harassment] charge," *Daniels*, 776 F.3d at 195, with the knowledge that overtime requests would be denied or that supervisors would fail to intervene regarding a co-worker's harassing behavior, these acts could plausibly support a retaliation claim.

### c.    Hostile Work Environment

A claim that an employer created a hostile work environment through sexual harassment requires a plaintiff to show that "1) [she] suffered intentional discrimination because of []her sex; 2) the discrimination was severe or pervasive; 3) the discrimination detrimentally affected the plaintiff; 4) the discrimination would detrimentally affect a reasonable person in like circumstances; and 5) the existence of *respondeat superior* liability." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (citation omitted). When the harasser is a

---

[5] Acord's actions subsequent to Jones's complaints include: (1) when Acord came to the Trevose station to find Jones outside of his scheduled shifts in September of 2015; and (2) the November 17, 2015 incident where Jones saw Acord parked in her neighborhood during his shift. These occurred after Acord had received notice of Jones's sexual harassment complaints to supervisors. As the Third Circuit has explained, "[a]n employer may be liable under Title VII for retaliatory harassment perpetrated by an employee's co-workers only if the *prima facie* case is satisfied and if there is a basis for employer liability for the coworker's conduct." *Moore v. City of Philadelphia*, 461 F.3d 331, 349 (3d Cir. 2006) (citing *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006)). Employer liability for retaliatory harassment turns on "traditional agency principles," and may be found "where supervisors 'knew or should have known about the [co-worker] harassment, but failed to take prompt and adequate remedial action' to stop the abuse." *Id.* (alteration in original). Here, Plaintiff alleges that multiple supervisors were aware of Jones's complaints, but nonetheless, permanent changes to Acord's shift or troop assignment were not made until after the November 17 incident.

co-worker, the negligence standard governs an employer's liability. *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 108 (3d Cir. 2009).

The PSP and Tinneny argue that Acord's actions were not "severe and pervasive enough to alter the conditions of [Plaintiff's] employment." The allegations suggest otherwise. Plaintiff details nearly a year and a half of unwanted advances by her co-worker, stretching from June of 2014 through November of 2015, and including physical harassment in the workplace, as well as stalking behavior. Plaintiff's supervisors were aware of the situation as early as April of 2015. Consequently, it is plausible that the PSP may have been negligent in failing to take adequate remedial measures by failing to permanently separate Acord from Jones until November 17, 2015. The motion to dismiss the hostile work environment claims will be denied.

### 2. PHRA Aiding and Abetting

Section 955(e) of the PHRA provides that a supervisor may be individually liable for aiding and abetting an employer's PHRA violations. *Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542, 553 (3d Cir. 1996) (citing 43 Pa. Stat. § 955(e)). Accessory liability may be premised on an employer's "own direct acts of discrimination or for . . . failure to take action to prevent further discrimination by an employee under supervision." *Brzozowski v. Pennsylvania Tpk. Comm'n*, 165 F. Supp. 3d 251, 262-63 (E.D. Pa. 2016) (citing *Davis v. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren P.C.*, 20 F. Supp. 2d 885, 887 (E.D. Pa. 1998)).

The PSP and Tinneny argue that all of the PHRA claims against Tinneny should be dismissed because there can be no accessory liability where the employer is not also liable. However, the three summary judgment opinions from this district[6] that the PSP and Tinneny rely

---

[6] *Deans v. Kennedy House, Inc.*, 998 F. Supp. 2d 393, 414 n.20 (E.D. Pa. 2014), *aff'd*, 587 F. App'x 731 (3d Cir. 2014); *Scott v. Sunoco Logistics Partners, LP*, 918 F. Supp. 2d 344, 357 n.5 (E.D. Pa. 2013); *Unangst v. Dual Temp Co.*, No. 10-cv-6811, 2012 WL 931130, at *9 (E.D. Pa. Mar. 19, 2012).

upon are procedurally inapposite. In each, the Court entered summary judgment in favor of the employer on PHRA claims, and accordingly entered summary judgment on the accessory liability claim against the supervisor because there can be no accessory liability if the facts do not support a principal's liability. In contrast, after considering the instant motion to dismiss, the Court has concluded that the facts alleged, if true, plausibly give rise to substantive PHRA retaliation and hostile work environment claims, for which Tinneny may be individually liable under section 955(e) of the PHRA.[7] Accordingly, the motion to dismiss the PHRA aiding and abetting claims against Tinneny will be denied.

      An appropriate order follows.

Dated: December 21, 2016.

                                              **BY THE COURT:**

                                              **/s/ Wendy Beetlestone**

                                              **WENDY BEETLESTONE, J.**

---

[7] The dismissal of the PHRA claims against the PSP on sovereign immunity grounds is irrelevant because the Plaintiff proceeds against Tinneny solely in his individual capacity.